I'm also hearing impaired. I'm wearing this device for the first time. It's working great. I bet. So we should all probably have one. I'm hearing Judge Perez on this really, really good. I'd like to address three issues. One, the rejection of claimant's complaints, the LJ's rejection of Dr. Deal's opinion, and the harmless error adoption.  The ALJ gave two main reasons. One, minimum treatment during the time period in question, and that the claimant's daily activities were inconsistent with her claim. Judge Hubel, in his findings and recommendations, actually addressed the same minimum treatment issue, that the claimant didn't have insurance and there's enough evidence there to support that. So I'm not going to get into that. Other than I do want to note that on ER 308, there's a medical note of July 31st, 2002. The claimant states she's had hip pain and she's told there's nothing they can do for her. So in fact, she's been on the presumption that, well, I go to the doctor, but they can't do anything. She has arthritis that keeps happening. So can I just interrupt you for a minute, then? Between July 2001 and the administrative hearing, the treatments that she was undergoing were just taking her prescribed pain medication. Is that basically it? Pretty much, yes. And there are notes. After 2002, there's ER 319, notes indicating arthritis and multiple joint pain, active arthritis and history of back and joint pain, 382-377. And she was taking quite a bit of medication as prescribed by her doctors. Is that correct? She was. The activities that the judge cites are inconsistent with her complaints come out of Dr. Starr's report. Dr. Starr reports her reading and driving, shopping, grocery shopping, and cooking. Note that his report was made on July 12, 2001, right at the time she alleged disability. But the other thing about his report is he doesn't state how often that all these activities happen or how much. And the preceding paragraph in his report claimed it describes being in pain constantly, her joints and back ache frequently, she has problems with headaches. So in the context of that, because he doesn't say how often she's actually doing all these activities, it's not an inconsistency. Wasn't there also a friend of hers who said she goes fishing during the fishing season? They go out to dinner. And that was done three months before she alleged disability. Well, that may be. So all of a sudden there was this catastrophic lack of ability to do anything, different from what the doctor reported and what her friend reported? I wouldn't call it catastrophic, but she did testify that her pain kept worsening and worsening. And, again, there was a report by her friend that she did go fishing twice a week. But then, again, it's three months before she alleged disability. She was also doing a daycare. Well, she also was working part-time, too, at that time. She was doing the home care, and she had a problem with the lifting. I understand that. But to say that it's three months before, was there any evidence put forward to suggest that any of those activities had decreased? Well, the evidence was her own testimony. Did she deny going fishing? I don't think she ever denied it or even talked about it. But she did talk about how, for instance, at the hearing, she talked about she does so, but she does it once a week. And she was very candid, too. She said she, at the hearing, she talked about how she did 80% of the household activities. But, again, she also testified to good and bad days. She testified that times she had a lean-over and that pain would stop her. She'd have to nap one hour during the day. So we're, again, having to look at the consistency of activities in terms of whether she could actually work full-time or not. The ALJ also ---- Mr. Graff, just to clarify something in my own mind, if the ALJ uses daily activities to impact on the credibility of the claimant, does the ALJ have a responsibility to quantify the extent of the daily activities and how they affect the ability to work? Well, it has to be, if he's using it to impeach credibility, then he has to show that those activities are inconsistent with the claims of the claimant, basically. If it has to do with showing that she can actually work full-time, then the ALJ has to show that it's inconsistent with the expectations of a full-time job. In this case, he was using it to question her credibility. And I'm arguing that she actually said, yeah, I can do household work. I can do all this stuff. I do so. I do have a life. And Farrah B. Bowen, the Ninth Circuit, has said you don't have to vegetate in a dark room. And this woman was, you know, candidly active to some extent, but she couldn't work full-time, and that's what she was basically saying. Doesn't she also say that she can't tell from day to day how she's going to feel and the consistency of her physical condition is an issue? That's exactly right. She said that she wondered if she could work part-time because of her consistency. She has good and bad days. The magistrate also, the ALJ also, talked about how that she testified she could sit only five to ten minutes at a time, and that was inconsistent with her going out to dinner with her husband. And, in fact, she didn't testify to that. She said she could sit five to ten minutes before she had to change positions. And so that was kind of a misquote by the ALJ. Where is that in the record, please, so that I can check that? ER 119 cannot sit more than 10 to 15 minutes. Thank you. Without changing position. And also there's also testimony to ER 400. Thank you. And, actually, it's interesting that at ER 119 and ER 400, where ER 119 is a written testimony a few years before, ER 400 is at the hearing. So she actually says the same thing consistently over a number of years. As far as Dr. Diehl, it's notable that Dr. Diehl, Westfall, who is a DDS doctor, and Flace, treating, examining, and consulting physicians, all agree that the claimant should be limited pretty much to sedentary work, sedentary in the regard that she couldn't stand on her feet more than two hours at a time. So you have three doctors actually agreeing with that. And the ALJ discounted Diehl's conclusions because he said that basically Diehl was basing his conclusions on claimant's subjective complaints. But, in fact, there was a lot of clinical observations that Diehl based his conclusions on. From a physical examination, she was slow getting from sitting to standing position, slow going from sitting to reclining. This was not mentioned in the ALJ's decision, by the way. She had a definite limp favoring the right leg. She was mildly unsteady at attempts to perform walking and tandem gait maneuver. All these were done by a doctor hired by DDS, and he observed her. And so he found that she could not, she'd have difficulty with activities that required standing and walking for more than 15 to 30 minutes at a time. Why don't you, you wanted to reserve time, so we'll let you do that. Okay, thank you very much. Go ahead. May it please the court. Good morning. My name is Carol Hoke. I represent the Commissioner of Social Security. I am here in place of Richard Morris, who had a family emergency and is the author of the brief and so forth on the case. He was not able to come this morning. We're glad to have you here. We're apologies. Thank you very much. Condolences. I'll do the best that I can in these circumstances. The Commissioner would espouse that the decision by the ALJ is supported by substantial evidence. We understand that's your general position. Maybe you could help us focus, at least me, focus. I'd be pleased to answer any questions. You have to let me finish the question first. The question that I would like to focus on is where we've been talking about the daily activities and whether they really are inconsistent because, as counsel pointed out, the issue is whether or not this petitioner could, in fact, work full time. And so she may have engaged in activities, but I'm not sure I see the limitations that she described in the ALJ's consideration. She can sit and stand and do certain things because she's going out to restaurants, she's going fishing and the like. How does that translate into being able to work a full-time job? I think where it translates is that the ALJ was pointing to activities that the appellant engaged in, for instance, work three-fourths to 80 percent of the time. Well, let's say I have a severe pain and have to move around. She said, I can't sit in one place steady. I have to move, I have to change position. That's what she testified to, at least at ER 400. And I can't stand in one place for more than five minutes. So when you're in your home, you can adjust and do whatever you need to do to cook or whatever those activities are. How does that then transfer over into the workplace? I think where the ALJ accounted for the appellant's testimony about having to take breaks, sit, lay down, et cetera, is actually in the residual functional capacity assessment, which appears on ER 62 at the bottom of the page. The ALJ stated that the appellant could stand and walk six hours out of an eight-hour day, sit six hours out of an eight-hour day. It doesn't say continuously. In fact, in the next sentence, he says, she requires an option to change positions from sitting and standing periodically. The ALJ didn't even quantify that she should be able to sit and stand, let's say, every half hour. He simply said periodically, which leaves it really open to whatever the appellant would need to do. So I believe that the RFC assessment is where you find the accommodation for the appellant's testimony, that she's not able to maintain a position and that she needs that flexibility. Okay. Okay. The other point that I would make, getting back to activities that the appellant engaged in, by her own testimony, she indicated that she and her husband had recently driven from their home, which I believe is a suburb of Portland, to Lincoln City to dinner. On the coast. On the coast. And they had made that trip in a single evening. It's some distance between Portland and the coast. Go to dinner, drive to the coast, go to dinner, drive back all in one evening, seems to indicate that the appellant's testimony about five and ten minutes sitting and having to change perhaps is not correct. I guess I'm not going to take your point, but that would suggest that somebody who has pain can't drive or ride as a passenger in a car and shift position in the car. I mean, it has back seats. She could lie down in the back seat or she could shift and round in the seat. People fly with disabilities. Judge Berzon will testify to that. Yes. I was on the airplane yesterday. So I'm not sure that that's overwhelmingly persuasive. I do know it takes a while to go over the coast and back. I don't think it's overwhelming evidence, but I think it's some evidence. She did not testify that in doing so she laid in the back seat. She did not testify they took breaks and actually subsequently testified. Did the ALJ ask her? No, that is true, but the ALJs then asked after they spoke about going to dinner at the coast, when was the last time you'd been out of town on an overnight trip? And the appellant testified that she and her husband had driven, again, from the Portland area of their home through Tri-Cities in Washington. They drove there in one day to celebrate her mother's birthday, and then they returned the next day. I'm having trouble understanding how that activity would transfer to the ALJs suggesting that she could resume her former job as a teacher's aide. I really see those as very, very different activities. You know, teacher's aide, I mean, I don't know, you know, it doesn't really matter the age of the children, but that's a very, very responsible job, and it's a very, it's potentially a very physically active job as well. As far as being a responsible job, I don't believe the ALJ found any difficulty or limitations, and I don't believe appellants are any bad. What I mean by responsible is I mean you have to be focused at all times. You can't just say, well, now I'm going to take a five-minute break, let these kids run wild or whatever, pay attention to them. I think what you're talking about is that you have to be participating perhaps. Yes, that's right. And on the job you can't just go and lay down. That's right. So I would agree with that. However, the examples of the activities, going to dinner, going to Richland, Washington, have to do with whether the ALJ found her to be credible or not in her allegations of her limitations. He found that they undermined her credibility. I think that, I agree with Mr. Graff. I think they actually buttressed her credibility. She didn't try to hide any of her pleasurable activities at all. She was very forthright with her daily activities. What she said is that she can't depend on how she's going to feel at any one time, which impacts her ability to hold down a job. I agree that's the case. Consistency is an issue. But I believe that the ALJ pointed to all the evidence that was before him and said her complaints are not credible. Therefore, he rejected that concept that she would not be able to maintain and arrived at the conclusion he did. The particular job of teacher's aide came from the vocational expert testimony. Did the Court have any other questions? Not in this courtroom. Judge Berzon? No, that's fine. Thank you. Thank you. Thank you. The RFC that the ALJ put forth was standing and walking six hours out of an eight-hour day. That's inconsistent with three doctors' opinions. And, in fact, under the Social Security grids, at age 50, the vocational expert testified that she did have transferable skills. So if she was limited to sedentary work at age 50, she should be found disabled under the grids 201.10 and 201.14. Okay. That's it. Thank you. Thank you. Thank you both for the argument. The case is submitted.
judges: Fisher, Berzon, Barzilay